

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-16-00087-CR |
| Appellant, | § | Appeal from the |
| v. | § | County Criminal Court at Law #2 |
| JORGE ARTURO ESPINOZA, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20150C10006) |
| | § | |

**DISSENTING OPINION**

Because I disagree with the majority's conclusion that the State met its burden of proof to present facts supporting a reasonable suspicion that Appellee Jorge Espinoza may be driving while intoxicated at the time of the traffic stop that is at issue in this case, I write separately. Although the majority does not reach the other two issues, I am also not convinced the State established reasonable suspicion to stop Espinoza for failure to maintain a single lane or to signal a lane change. Contrary to the majority, I would conclude that the trial court did not err in granting Espinoza's motion to suppress and would affirm the trial court's order. Respectfully, I dissent.

*DWI*

The majority concludes that the State presented facts supporting a reasonable suspicion

that Espinoza may be driving while intoxicated at the time the stop was made. On review of the record, I disagree that the State met its burden to show that the officer had sufficient information required for a warrantless traffic stop. "Reasonable suspicion requires more than a hunch; it exists only when an officer has specific, articulable facts that, taken together with reasonable inferences from those facts, would lead the officer to reasonably conclude that the person detained is, has been, or soon will be, engaging in criminal activity." *Delafuente v. State*, 414 S.W.3d 173, 177 (Tex.Crim.App. 2013). A reasonable suspicion determination is objectively made by considering the totality of the circumstances. *Id*.

To summarize, our record includes Officer Wilkinson's affidavit prepared on the morning of the arrest, his testimony at the suppression hearing, and the video recording of the traffic stop as seen from Officer Wilkinson's patrol car. In his affidavit, Wilkinson described that he had observed Espinoza's vehicle straddle the right lane marker, and he began to follow. He then described that he observed the vehicle continue to straddle the lane marker between the middle and right lane of travel. Articulating no further details, he described that he then initiated a traffic stop and met with the driver.

At the hearing, Wilkinson testified Espinoza's Jeep caught his attention when he observed him make a U-turn and then move over to the right lane of travel and then back to the middle lane without signaling. Officer Wilkinson also testified that he stopped Espinoza in an area with establishments that serve alcohol until 2 a.m. Giving further details, Wilkinson testified he saw Espinoza's vehicle, "kind of drift over and drive . . . on the line and then kind of drift back and – he did that a few times." On deciding to pull him over, he stated he had observed Espinoza, "enter the right lane again and then back to the middle lane without signaling, and then I initiated a traffic

stop."

On cross-examination, defense counsel played the dashcam video from Wilkinson's patrol vehicle and intermittently paused to ask questions. Defense counsel asked Wilkinson to point out each time he saw a traffic violation.[1] As Wilkinson responded, he described seeing Espinoza, "straddling the lanes right there," which he explained meant he was "driving on the lane markers." Wilkinson added, however, that when he observed the "straddling," it was not unsafe and, as shown on the video, it did not meet the definition on which he had been trained. Straddling, he explained, was defined by the National Highway Traffic Safety Administration (NHTSA) as a vehicle moving straight ahead with the center or lane marker between the left-hand and right-hand wheels. Although Wilkinson described Espinoza's tire as being wider than the lane marker, and thus, it was "technically" in the other lane, he agreed that what was seen on the video differed from the NHTSA definition.

Wilkinson also conceded that Espinoza had not actually changed lanes at the point in the video which he had described as lane straddling. When asked to continue and identify other violations, Wilkinson pointed out in the video, "[r]ight there, it looked like real brief – right there, he touched [the lane divider]." On further questioning, however, Wilkinson agreed that even though Espinoza, "began on the lane, the marker," he drove "practically, yes, he is in his lane of travel." After further viewing, Wilkinson then said, "[h]e's actually over the line now," but also added that no one else was on the road and Espinoza was not in danger of hitting anyone. Wilkinson asserted he had identified two violations at the beginning concerning failure to signal

---

[1] Both the trial court's Findings of Fact and Conclusions of Law and the State's Brief refer to timestamps from the dashcam video. Although we, too, can view video timestamps, our reporter's record does not link witness testimony to any timestamps.

lane changes. First, “he entered the other lane of travel a little bit and then came back;” and, second, “[h]e moved over – whether he drifted or whatever – he moved over to the right lane a little bit, entered the right lane, with the right side of his car, and then came back over without signaling.” Clarifying, Wilkinson testified that he agreed that no signaling is needed if he’s not changing lanes.

Officer Wilkinson testified that he had been a peace officer with the El Paso Police Department for nine and a half years and was assigned to the DWI Task Force. Without providing details, he also testified that he was SFST certified, had taken numerous courses on identifying intoxicated drivers, and had attended numerous training sessions related to impaired drivers. When first asked whether he had also suspected intoxication before initiating the stop, Wilkinson replied, “I don’t recall having a hunch. I just remember pulling him over for the violation.” Later, on redirect, Wilkinson testified differently stating he had reasonable suspicion to believe that Espinoza was intoxicated at the moment when he turned on his lights to initiate his stop.

When read in its entirety, Wilkinson’s testimony was equivocal on whether he initiated a traffic stop based on a suspicion of DWI based on facts and reasonable inferences. When asked whether moving from one lane and back without signaling indicated a sign of intoxication, Wilkinson responded “no.” Then, when asked whether “drifting from lane to lane,” in and of itself, would indicate a sign of intoxication, Wilkinson responded “[i]t’s a cue, based on my experience, that—over the years, its’s not normal behavior for someone to kind of straddle the lane and come back. Especially the time of day, the area, it’s a cue, yes.” The area, he further explained, was well-known “for people to go and get drinks.” With this answer, Officer Wilkinson likely provided sufficient information to support having suspicion of intoxication. On

cross-examination, however, he went on to say that he had *not* formed "a hunch" of impairment, despite years of training, and he described the area not for assessing the totality of circumstances, but rather, as a response to the prosecutor asking where he was at when he initiated his stop.

Despite his training and experience, Officer Wilkinson did not clearly articulate having a suspicion of DWI as a reason he initiated the traffic stop and, on occasion, said otherwise. Officer Wilkinson's testimony left such a light impression with the trial court that the offense itself is not even mentioned in the court's findings of fact and conclusions of law. Indeed, the court concluded that Espinoza's vehicle did not swerve or veer, but instead moved in a slow graduated manner before moving in a similar manner back to the left, and only the vehicle's tires touched the white line marker on the street.

On appellate review, DWI is treated as having been implicitly rejected as a justification for the stop given this offense is not mentioned in the court's ruling. *See State v. Alderete*, 314 S.W.3d 469, 473 (Tex.App.--El Paso 2010, pet. ref'd). Following that rejection, I would therefore imply findings regarding Wilkinson's testimony that are consistent with the trial court's ruling and supported by the record. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App. 2000). Given Officer Wilkinson's equivocal testimony, there is ample ground to believe that the trial court found his testimony lacking in detail or not credible. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997)(credibility and demeanor determinations must be given almost total deference).

Finally, when determining whether an officer had reasonable suspicion to conduct a traffic stop for DWI, we should consider the time of day and the area in which a traffic stop occurs, in addition to testimony from the officer about the driving pattern of the vehicle under the totality of

the circumstances. *See Curtis v. State*, 238 S.W.3d 376, 379–80 (Tex.Crim.App. 2007); *Alderete*, 314 S.W.3d at 473. However, I find *Curtis* and *Alderete* distinguishable. In *Curtis*, because the trial court had ruled in favor of the prosecution, historical facts and inferences on review were supportive of an officer engaging in a traffic stop based on reasonable suspicion of a driver committing a DWI offense. *Id.*, at 381. In *Alderete*, we reversed a trial court's suppression ruling because the officer testified the driver "was stopped not because of a violation of the traffic code, but based on suspicion of intoxication . . . ." *State v. Alderete*, 314 S.W.3d 469, 473 (Tex.App.--El Paso 2010, pet. ref'd). Thus, *Alderete* included direct testimony from the officer that he had suspected impairment of the driver as a basis for the initial stop.

Here, I would conclude that the trial court's ruling does not fall outside the zone of reasonable disagreement considering that Officer Wilkinson testified inconsistently about having formed a reasonable suspicion to believe that Espinoza was impaired while driving. Contrary to the majority opinion, I would afford greater deference to the trial court's determination of historical facts to the extent that a determination of reasonable suspicion depends to some extent on Officer Wilkinson's credibility in articulating his observations and reasonable inferences. On review, I would hold that the trial court did not abuse its discretion in implicitly rejecting the State's theory that Wilkinson's testimony supported reasonable suspicion of a DWI offense. Accordingly, I would overrule the State's first and fourth issue.

*Failure to Maintain a Single Lane*

I am also not convinced that Officer Wilkinson had reasonable suspicion to stop Espinoza for failure to maintain a single lane. In its second issue, the State argues there is indisputable visual evidence that an officer in Wilkinson's position would have been justified in detaining

Espinoza for failing to maintain a single lane. The State concedes in its brief that Officer Wilkinson testified he had initiated his traffic stop not for a failure to maintain a single lane violation, but for a failure to signal his intention to make a lane change. Rejecting the lane violation, the trial court's findings state, "[t]he video . . . does not show that the wheels crossed completely over to the right lane, as stated by the officer, and he further stated that these movements were not unsafe and posed no other problems."

Texas Transportation Code Section 545.060, in pertinent part, states that "an operator on a roadway divided into two or more clearly marked lanes for traffic: (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely." TEX.TRANSP.CODE ANN. § 545.060(a)(1–2). In *Leming v. State*, the Court of Criminal Appeals construed the statute for the first time and held it imposed two independent requirements. 493 S.W.3d 552, 559 (Tex.Crim.App. 2016)(plur. op.). As *Leming* found, the statute imposes a requirement aspect (to maintain a single lane as far as is practical) and a prohibition aspect (do not change lanes unless it is safe to do so). *Id.* Because the two aspects are joined by the conjunction "and," *Leming* held that either statutory prohibition provides a means of committing the same offense. *Id*. "[I]t is an offense to change marked lanes when it is unsafe to do so; but it is also an independent offense to fail to remain entirely within a marked lane of traffic so long as it remains practical to do so, regardless of whether the deviation from the marked lane is, under the particular circumstances, unsafe." *Id*., at 559–60. Lower court decisions that interpreted the statute singularly, *Atkinson v. State*, 848 S.W.2d 813 (Tex.App.--Houston [14th Dist.] 1993, pet. ref'd) and *Hernandez v. State*, 983 S.W.2d 867 (Tex.App.--Austin 1998, pet. ref'd), respectively, were expressly rejected by *Leming*. *Id*., at 559.

Like this case, the facts in *Leming* concerned the first prohibition only—whether the driver failed to drive as nearly as practical entirely within a single lane of traffic. *Id*., at 561. In *Leming*, the officer could only testify that the "tires were on the stripes," and the video established that much—but did not clearly show the vehicle entered the next lane. *Id*. In reviewing whether reasonable suspicion had been met, *Leming* concluded it was not necessary to decide whether driving on the divider stripes constituted a failure to stay "entirely within" a designated lane. *Id*. "For a peace officer to stop a motorist to investigate a traffic infraction, as is the case with any investigative stop, proof of the actual commission of the offense is not a requisite." *Id*., (quoting *Drago v. State*, 553 S.W.2d 375, 377 (Tex.Crim.App. 1977)). Instead, *Leming* focused on a review of the totality of the circumstances, which in that case included not only the testimony of the officer but additionally included testimony from a concerned citizen. *Id*.

In *Leming*, the citizen involved had originally prompted the investigation by reporting that a vehicle on the roadway was "swerving from side to side." *Id*., at 554. When the arresting officer first observed the defendant's vehicle, he saw that it was traveling thirteen miles per hour below the posted speed limit and that the driver "slowed down more and more." *Id*. The vehicle then began to swerve to the left, came "uncomfortably close" to the street curb, drifted back to the right, and came "precariously close" to the curb at least twice more before the officer pulled the vehicle over after following it for several miles. *Id*., at 554, 563. The officer justified his stop pursuant to the community caretaking function. *Id*. Thus, the record in *Leming* showed that the officer involved, "knew from personal observation that [the driver] had several times at least come very *close* to entering the adjacent lane—even if he could not quite tell whether [he] had actually entered it—and he knew that [the citizen] had also observed [the driver's vehicle] to be 'swerving'

even before [the officer] arrived on the scene." [Emphasis added]. *Id*., at 561. Under the totality of the circumstances, *Leming* concluded the record justified a temporary detention to investigate whether the driver involved failed to remain in his dedicated lane of traffic as far it was practical to do so under the circumstances. *Id*. Thus, in analyzing the first prohibition (a requirement to practically remain in a single lane), *Leming* reiterated it mattered not whether the driver's failure to remain in his lane was additionally unsafe under the circumstances. *Id*.

Here, in deciding whether reasonable suspicion of a lane violation supported the temporary detention, the trial court considered Officer Wilkinson's testimony, viewed the dashcam video, and read the affidavit accompanying the search warrant. In conclusion of law four, the trial court stated, "the defendant's vehicle did not swerve or veer, but instead moved to the right in a slow, graduated manner before moving in a similar manner back to the left." Moreover, "[o]nly the vehicle's tires touched the white lane marker on the street." More specifically, in rejecting the lane violation as a basis for the stop, the trial court noted the officer testified he observed violations at "2:10:47, 2:10:53, and 2:10:54," for his determination to stop Espinoza. Reaching a contrary conclusion from the officer, the trial court stated:

> The video, on the contrary, does not show that the wheels crossed completely over to the right lane, as stated by the officer, and he further stated that these movements were not unsafe and posed no other problems. The traffic was light and no other vehicles took evasive action to avoid the defendant's vehicle, nor was there any indication that the weaving was part of a more erratic behavior or was unsafe[.]

Thus, in addressing both prohibitions of the statute, the trial court found: (1) that the video did not show that the wheels crossed completely over to the right lane as stated by the officer; and (2) that movements seen were not unsafe and posed no other problems. The trial court concluded that Espinoza's vehicle moved in a slow, graduated manner before moving in a similar manner

back to the left, and only the vehicle's tires touched the white lane marker on the street. The trial court further concluded that the officer did not have reasonable suspicion to stop the defendant and further concluded that the stop was unlawful.

Viewing the record in the light most favorable to the trial court and deferring to the court's determination of historical facts, I would hold that the trial court did not abuse its discretion in finding that Wilkinson had unlawfully detained Espinoza for a suspected violation of Section 545.060. *See* TEX.TRANSP.CODE ANN. § 545.060(a)(1–2). Both Officer Wilkinson's testimony and the dashcam video support the trial court's finding that Espinoza's vehicle mostly remained within the marked lane in which he was traveling and did not make unsafe movements. Unlike *Leming*, Espinoza did not swerve dangerously from left to right, did not come close to striking a curb, and was not traveling well below the speed limit. Officer Wilkinson testified no one else was on the road and Espinoza was not in danger of hitting anyone.

Unlike *Leming*, a concerned citizen did not call in and report additional swerving unseen by the officer or unrecorded on video. Officer Wilkinson did not stop Espinoza pursuant to the community caretaking function, like the officer in *Leming* did, but originally testified that it was because of a purported signal violation. *See Leming*, 493 S.W.3d at 554. Although Officer Wilkinson did not testify how long he followed Espinoza before pulling him over, the time stamp of the video clearly shows it was under a minute—far less than the "several miles" and "several minutes" of time and distance reported by the arresting officer in *Leming*. *See id*., at 554.

Based on the totality of the circumstances, I would hold that the trial court did not err by determining the stop lacked reasonable suspicion for failure to maintain a single lane. The trial court's findings of historical facts—the tire's touch of the lane marker coupled with moving to the

right in a slow, graduated manner before moving in a similar manner back to the left—without other indicators of criminal activity, were not enough to justify the stop for a violation of failing to maintain a single lane. I would overrule the State's second issue.

*Lane Change Violation*

Finally, although the majority also does not reach this issue in its opinion, I would hold that Officer Wilkinson lacked reasonable suspicion to stop Espinoza for failure to signal a lane change. In its third issue, the State argues Wilkinson had sufficient reasonable suspicion to stop Espinoza as he testified he observed Espinoza's right front tire cross over the white lane marker in violation of Texas Transportation Code Section 545.104, and his testimony was supported by the video evidence.

Texas Transportation Code Section 545.104(a), states in pertinent part, "[a]n operator shall use the turn signal . . . to indicate an *intention* to turn, change lanes, or start from a parked position." [Emphasis added]. *See* TEX.TRANSP.CODE ANN. § 545.104(a). Thus, from the plain language of the statute, the driver's intention to change lanes is required for Section 545.104 to apply. *See, e.g.*, *Power v. State*, No. 13-05-693-CR, 2006 WL 2516525, at *2–3 (Tex.App.--Corpus Christi July 27, 2006, no pet.)(mem. op., not designated for publication); *State v. Griffin*, No. 04-12-00192-CR, 2003 WL 21018319, at *2 (Tex.App.--San Antonio May 7, 2003, no pet.)(not designated for publication). Weaving, such that only one or two of the vehicle's tires cross over the lane marker, does not constitute a lane change under Section 545.104 when the driver did not intend to change lanes. *See, e.g.*, *Power*, 2006 WL 2516525, at *2–3 (holding that an officer did not have reasonable suspicion to stop a driver for failure to signal a lane change when the driver never changed lanes, but instead, the driver's two right tires only drifted into the outside lane and

back). As recently confirmed by the Court of Criminal Appeals, "[c]riminal statutes outside the penal code must be construed strictly, with any doubt resolved in favor of the accused." *State v. Cortez*, 543 S.W.3d 198, 206 (Tex.Crim.App. 2018)(quoting *Stevenson v. State*, 499 S.W.3d 842, 849 (Tex.Crim.App. 2016)).

Here, the trial court's factual findings state that Wilkinson testified he observed Espinoza drift from lane to lane approximately two times and failed to signal his lane change. Moreover, its conclusions of law state that Wilkinson identified violations he observed at 2:10:47, 2:10:53, and 2:10:54. After viewing the video, however, the trial court concluded that the video did not support the officer's testimony as it did not show that the wheels crossed completely over to the right lane as stated by the officer.

I would hold that the record supports the trial court's findings as there is nothing to indicate that Espinoza intended to change lanes nor ever executed a lane change until after the officer turned on his emergency lights to initiate a traffic stop. Moreover, as stated earlier, Officer Wilkinson's testimony on the issue was equivocal and the State failed to elicit sufficient facts to support an objective determination of a signal violation. In fact, Wilkinson admitted that a driver does not need to use a turn signal if he does not intend to change lanes. On this record, I would hold that the trial court did not abuse its discretion in concluding that Officer Wilkinson was not justified in stopping Espinoza for suspicion of violating Section 545.104. *See Power*, 2006 WL 2516525, at *2–3; *Griffin*, 2003 WL 21018319, at *2. I would overrule the State's third issue.

*Conclusion*

In sum, I do not believe that Officer Wilkinson had reasonable suspicion to stop Espinoza for a traffic offense or for DWI. I would overrule the State's issues and affirm the trial court's

decision granting Espinoza's motion to suppress, and therefore I respectfully dissent from the majority in this case.

November 30, 2018

GINA M. PALAFOX, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.